IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

927 COLE STREET, GOLDEN, COLORADO, and

2008 TOYOTA HIGHLANDER VIN # JTEES42A182076495;

      Defendants.

---

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

---

The United States of America, by and through Attorney General of the United States Eric Holder, United States Attorney Barry R. Grissom, and Richard L. Hathaway and Christine E. Kenney, Special Attorneys, pursuant to the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture Actions G(2), states:

JURISDICTION AND VENUE

1.      The United States of America has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. § 981, seeking forfeiture of the defendant property that is proceeds of 18 U.S.C. §§ 1341, 1343 and 2314, and is property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.  The court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

1

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district and/or pursuant to 28 U.S.C. § 1395, because the defendant property is located in this district.

<div align="center">DEFENDANT PROPERTY</div>

3.      The defendant property is described as:

a.      927 Cole Street, Golden Colorado 80401, which is more particularly described as Parcel B, Exemption Survey Section 6, Township 4 South, Range 69 West, E18-3-93 according to the Exemption Survey Recorded June 4, 1993 at Reception No. 93079644 in Book 113 at Page 26, County of Jefferson, State of Colorado; and

b.      2008 Toyota Highlander, 4 Door Wagon Sport Utility, red in color, VIN # JTEES42A182076495, Colorado License Plate # 325RLP.

<div align="center">FACTUAL BASIS FOR FORFEITURE</div>

Except as otherwise noted, all of the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

<div align="center">Overview of the Scheme</div>

4.      This investigation originated from information received by the Federal Bureau of Investigation (FBI) and the United States Securities and Exchange Commission (SEC) alleging that Richard and Marie Dalton (the Daltons) and Universal Consulting Resources (UCR) ran a scheme that fraudulently raised over $17,000,000 from at least 130 investors in 13 states since 2007 and continuing through 2010.

5.      As part of the scheme, the Daltons and UCR lured investors by guaranteeing investment returns typically in the range of 48% to 120% annually. The Daltons and UCR

claimed that these returns would be paid monthly from profitable international note and diamond trading. The Daltons and UCR also told investors that the investments were "extremely low risk" and that their money could be returned at any time.

6.      Early investors were paid the exorbitant returns guaranteed by the Daltons and UCR, and about $10,000,000 in "profit" payments were made to investors. But at least a significant portion – if not the vast majority – of these payments were from other investor funds, not profitable ventures. Beyond using them to pay investors' returns, the Daltons also used investor funds to pay for their lifestyle, including a nearly $1,000,000 home, $38,000 for a new car, $5,000 for their daughter's wedding, and numerous cash withdrawals to fund other personal expenses.

7.      In March and April of 2010, the Daltons and UCR stopped providing the purported "profit" payments to investors, and their scheme began to collapse.  From that time until at least November 12, 2010, the Daltons and UCR have made false and misleading statements to investors to try to lull them into complacency and delay the disclosure of their fraudulent scheme.

8.      The Daltons and UCR intentionally deceived investors into buying their securities through numerous misrepresentations and omissions of material fact.  The Daltons and UCR lied by claiming that their securities would pay high rates of return based on low risk, profitable trades, when in fact they were operating a scheme using later investments to pay profits to investors.

9.      Based on our investigation culminating in a civil complaint filed by the SEC on November 16, 2010 in the U.S. District Court, District of Colorado, Civil Action No. 10-cv-02794-REB-KLM, against the Daltons and UCR, we have learned the following:

3

10.     Richard Dalton is the managing director and sole employee of UCR, a New Mexico LLC which was incorporated in 2007. The Daltons have had no other source of income other than UCR.

11.     From about March 2007 through at least about June 2010, the Daltons and UCR solicited investors to purchase interests in investment contracts, which were securities.  The Daltons generally referred to the investment contracts as either the "Trading Program," which the Daltons and UCR began offering in about March 2007, or the "Diamond Program," which the Daltons and UCR began offering in early 2009.

12.     Investors typically learned about UCR's investment programs from "finders" or "brokers" who were paid commissions by UCR, or from earlier investors who had received what they believed to be monthly distributions of profits from UCR, some of whom also received commissions for bringing in new investors.  According to one investor, "as a result of the consistent returns from this investment, I started telling my friends and family about the investment I had made with the Daltons.  My friends and family started meeting with the Daltons and some of them eventually invested with the Daltons."  Some investors invested funds from their self-directed IRA retirement accounts.

13.     As part of soliciting investors for the Trading Program, the Daltons and UCR falsely told prospective investors that their invested funds would be held safely in an escrow account at a bank in the United States, and that a European trader (often referred to simply as "the Trader," but never known or referred to by name) would use the value of that account, but not the actual funds, to obtain leveraged funds to purchase and sell bank notes.

14.     According to the Daltons, the trading was profitable enough that they were able to guarantee returns of four to five percent per month – or 48% to 60% per year – to investors.

Some investors were guaranteed higher rates of return, including one investor who was guaranteed returns of 75% to 80% per month – or 900% to 960% per year. Richard Dalton claimed that he had successfully been running the Trading Program for nine years.

15.     Richard Dalton and UCR required investors to sign an "Investment Structure Agreement," which he would often transmit by facsimile or e-mail, and which represented that investors' money would be placed into an escrow account, and transferred as necessary to UCR trading accounts. The Investment Structure Agreement for the Trading Program stated that the trading accounts would serve as collateral to allow for profitable trading of financial instruments:

> "The purpose of this Investment Structure Agreement shall be to enter into a Trading Agreement with various financial institutions as determined by UCR, LLC, to generate profits from the Trading of Financial Instruments of which UCR, LLC will distribute profits of 5% per month to the Investors.  Distribution of profits is to be made monthly."

16.     For both the Trading Program and Diamond Program, the Daltons and UCR guaranteed a specific monthly return for each investor and claimed that the investment contracts had "extremely low risk." In addition, the Investment Structure Agreement stated that "UCR, LLC account management is re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions."

17.     The Investment Structure Agreement stated that investors' money could be returned at any time: "An Investor can cancel this Agreement at any time and request that all money as principal investment and all other proceeds from profits be returned."

18.     The Daltons and UCR claimed that the Diamond Program would earn investors profits by trading in diamonds.  The Investment Structure Agreement for the Diamond Program was generally nearly identical to that of the Trading Program, except that it defined the "Financial Instruments" (which were to be traded for profit) to include "precious stones," and

guaranteed a ten percent monthly return – or 120% yearly return – on trading transactions. Some, but not all, of the Diamond Trading Program agreements also more particularly described their purpose as:

> "To enter into a Trading Agreement with various providers and resources as determined by UCR, LLC, to generate profits from the trading (buying and selling) of uncut or cut diamonds from which UCR, LLC will distribute profits of 10% to the Investors per completed transaction (or turn) with at least one completed transaction estimated per month."

19.     The Daltons and UCR raised approximately $17,000,000 from investors and made monthly payments to investors from at least 2008 through about April 2010, as evidenced by UCR's bank records. For example, one investor placed $25,000 in the Trading Program in June 2009 and received monthly five-percent interest payments ($1,250 each) from August 2009 through the early part of 2010. The same investor then placed $70,000 in the Diamond Program in September 2009, and received only two 10% interest payments of $7,000 each. Other investors received monthly interest payments on their investments up until March or April 2010. Investors understood from the Daltons that these payments reflected profits from either the Trading Program or the Diamond Program.

20.     The Daltons and UCR's Trading and Diamond Program were nothing more than a sham as there were no investment profits. The vast majority of funds that came into UCR were from investor money, not from any actual profit-generating activity. An analysis of UCR's bank records demonstrate that at least $5,000,000 of the approximately $10,000,000 in purported profit payments were not from investment profits, but rather payments from funds provided by other investors between 2008 and 2010.

21.     Beyond using investor funds to pay investors' returns, the Daltons also used investor funds to pay for their lifestyle, including a nearly $1,000,000 home, $38,000 for a new

car, $35,000 for cosmetic dental work, $5,000 for their daughter's wedding, and numerous transfers to the Daltons' personal bank account totaling approximately $250,000 to fund other personal expenses.

22.     As a part of the scheme, the Daltons and UCR made numerous false and misleading statements about UCR and the Trading and Diamond Programs and engaged in acts of fraud and deceit on prospective and existing investors.  Perhaps most critically, the Daltons never disclosed to investors that a significant amount of "profit" payments were actually just payments made from new investors' funds, making the Trading Program and Diamond Program fraudulent schemes.

23.     With respect to the Trading Program, the Daltons and UCR misrepresented that:

a.     The Trading Program would generate profits from the trading of financial instruments.

b.     The Trading Program would result in a guaranteed minimum gross profit margin per month of four or five percent.

c.     The Trading Program had "extremely low risk."

d.     UCR account management was re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

e.     Investors' money could be returned at any time.

f.     Investors' money would be held in escrow in the United States and never used or transferred to another account.

g.     Investors' money would be used as leverage to buy and sell bank loans.

h.     The Trading Program was an overnight foreign lending program between banks.

7

i.      The Daltons worked with an overseas trader who performed the trading.

j.      The Daltons had been successfully running the Trading Program for nine years.

k.      Investors' money would be completely safe.

24.     In fact, those claims were false because:

a.      The Trading Program did not generate any significant profits from the trading of financial instruments.

b.      The Trading Program did not result in a gross profit margin per month of four or five percent, as it did not generate any significant profits.

c.      The Trading Program had extremely high risk.

d.      UCR account management was not re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

e.      Investors' money could not be returned at any time, due to insufficient funds.

f.      Investor's money was not held in escrow in the United States and was used and transferred to other accounts.

g.      Investors' money was not used as leverage to buy and sell bank loans.

h.      The Trading Program was not an overnight foreign lending program between banks.

i.      The Daltons did not work with an overseas trader who generated significant profits from trading.

j.      The Daltons had not been successfully running the Trading Program for nine years.

   k.  Investors' money was not safe.

25.  With respect to the Diamond Program, the Daltons and UCR falsely claimed that:

   a.  The Diamond Program would generate profits from the trading of uncut or cut diamonds.

   b.  UCR would distribute profits of ten percent to the investors per completed transaction with at least one completed transaction estimated per month.

   c.  Investors' money would be used to purchase diamonds in foreign countries and resell them in the United States.

   d.  The purchased diamonds were insured.

   e.  The Diamond Program would generate profits from the trading of financial instruments, including precious stones.

   f.  The Diamond Program guaranteed a ten percent monthly return on diamond-trading transactions.

   g.  The Diamond Program had "extremely low risk"

   h.  Investors' money could be returned at any time.

26.  In fact, those claims were false because:

   a.  The Diamond Program did not generate any significant profits from the trading of uncut or cut diamonds.

   b.  UCR did not distribute profits of ten percent to the investors per completed transaction with at least one completed transaction estimated per month.

   c.  Investor's money was not used – or was only used to a limited degree – to purchase diamonds in foreign countries and resell them in the United States.

   d.  There is no evidence that any purchased diamonds were insured.

     e.    The Diamond Program did not generate significant profits from the trading of financial instruments, including precious stones.

     f.    The Diamond Program did not result in a ten percent monthly return on diamond-trading transactions.

     g.    The Diamond Program had extremely high risk.

     h.    UCR account management was not re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

     i.    Investors' money could not be returned at any time, due to insufficient funds.

27.    The Daltons and UCR knew that their statements to prospective and existing investors were materially false or misleading because they knew that:

     a.    Investor payments were not from profitable trading, but rather were made from new investor funds;

     b.    Neither the Trading Program nor the Diamond Program operated or existed as described by the Daltons and UCR;

     c.    Neither the Trading Program nor Diamond program generated sufficient profits to pay the claimed investor returns;

     d.    Investors' money was not kept in escrow, but rather was used to pay other investors and to support the Daltons's home and lifestyle;

     e.    Investors' money was not safe and could not all be returned due to insufficient funds; and

     f.    They had not successfully run the Trading Program for nine years, but rather operated a fraudulent scheme for at least two years.

10

Many of the Daltons' and UCR's false statements were made by phone, e-mail, facsimile, or through United States mail.

28.     In March of 2010, the Daltons and UCR stopped providing the purported "profit" payments to investors, and their scheme began to collapse.  From that time until at least November 12, 2010, when the Daltons left the United States for South Africa, the Daltons made false and misleading statements to investors to try to lull them into complacency and delay the disclosure of their fraudulent scheme. Examples are as follows:

a.     In June 2010, the Daltons claimed that there had been significant changes in the Trading program and the European Traders had to switch from using Deutsch Bank to another prominent Swiss bank.

b.     On June 25, 2010, Richard Dalton sent a letter to investors claiming that his attorneys had decided that the investment programs were not totally SEC compliant and that he would be dismantling and discontinuing all business operations.

c.     On September 15, 2010, after months of lulling investors, Richard Dalton sent a letter to investors claiming he was in the process of liquidating a cache of diamonds, but ran into some problems. The airplane that goes to Africa every week had engine number three go out and was forced to land in Amsterdam for repair. The Daltons further claimed that once the delayed diamonds arrived in New York, it was discovered that 18,000 of the 50,000 carats were fake diamonds. The Daltons were now waiting for the African Government to replace the 18,000 stones.

d.     In November of 2010, Richard Dalton told several investors that he was leaving for South Africa to personally resolve the situation. The Daltons have not returned to the United States since their departure to South Africa in November 2010.

11

29.     Based on the facts incorporated within the SEC's civil complaint and additional evidence obtained from several witness interviews conducted by the FBI, a search warrant was obtained and executed on December 17, 2011, on the Daltons's residence located at 927 Cole Street, Golden, Colorado. The related case number is 10-SW-5548-CBS.  Investigators analyzed numerous documents and financial records, including electronic evidence stored on seized computers. The evidence obtained from the search warrant corroborates the findings in the SEC investigation.

30.     The FBI interviewed UCR investors, including those referred to here as Investor #1 (a law enforcement officer), Investor #2, and Investor #3.  All three confirmed the information in the SEC complaint.  Specifically, all three indicated that they were promised returns between 48% and 120% annually, they were told that the investments were extremely low risk, and they were told that their money could be returned at any time.  Documents investors received from the Daltons and then provided to investigators support the investors' descriptions of representations made about the Daltons' UCR programs.

31.     According to information provided by Investor #1, the Daltons said that the Diamond Program would provide returns of 10% per month or 120% per year.  The Daltons also said that the diamonds involved in the program were insured and were transferred using Brinks Security Services.

32.     Richard Dalton claimed that he had been successfully running one or both of the investment programs for nine years.  Based on the bank records reviewed by IRS-CI and information from the investors interviewed, there do not appear to have been any investments with UCR prior to 2007. Records from Bank of America indicate that the primary UCR checking account into which investors' funds were actually deposited was opened in June of 2007. No

12

documentary evidence, bank records, interviews, or information from witnesses indicated that the Daltons have been running the trading program successfully for nine years.  On June 24, 2010, Richard Dalton was deposed by the SEC in a related matter involving a company called IV Capital, LTD and testified that he formed UCR in 2007.

33.     Richard Dalton required investors to sign an "Investment Structure Agreement," which he would often transmit to investors by facsimile or e-mail. The Investment Structure Agreement contained the following information:

a.     Investment Management: Universal Consulting Resources, LLC (Herein referred to as "UCR", LLC), 927 Cole Street, Golden, CO 80401 A corporation registered in the state of New Mexico, herein represented by: Richard D. Dalton, Director of Finance.

b.     The Investment Structure Agreement stated that "UCR, LLC account management is re-enforced by the evaluation of top professionals and licensed Third Party services in investment and trade transactions."

c.     The Investment Structure Agreement further stated that an investor's money could be returned at any time: "An investor can cancel this Agreement at any time and request that all money as principal investment and all other proceeds from profits be returned."

34.     The investors interviewed have all indicated that they made repeated attempts in October and November of 2010 to get their money back from the Daltons, but they were met with negative results.

35.     An analysis by IRS-CI of UCR's bank accounts at Bank of America does not support claims of successful "note trading" or "diamond trading" resulting in profits of 48% to 120% as claimed by the Daltons. The signatories on the primary UCR bank account were Richard D. Dalton and Marie Dalton.

13

36.     Many of the Daltons' and UCR's false statements were made by telephone, e-mail, facsimile, or through the United States Mail. The Daltons had investors from 13 states and several foreign countries whereby false and misleading statements were made in furtherance of the scheme using all of these methods of communication.

37.     Examples of the use of wires and mailings in furtherance of the Daltons' scheme are evidenced by Investor #1's account of events. In approximately June of 2009, Investor #1 initially invested $25,000 with the Daltons in the Trading Program, in which the Daltons guaranteed investment returns through international note trading. In the fall of 2009, Investor #1 invested $70,000 in the Daltons' Diamond Program.  From these two investments, Investor #1 estimates that $24,000 was returned to him in the form of checks mailed through the U.S. mail from the Daltons.

38.     In March or April 2010, Investor #1 was advised by the Daltons that the Diamond Program was ending because of government regulations and that Diamond Program investment funds could be returned to Investor #1 or placed into the Trading Program.  Investor #1 made repeated, unsuccessful requests for the return of his investment via telephone calls to telephone number (XXX) XXX-3747, the Daltons' cell number, as well as by email to the email address of ucr777@comcast.net , UCR's email address.

39.     Investor #1's attempt to get his money back was met with a whole host of excuses.  One excuse was that a C-130 aircraft the Daltons were using to transport diamonds had developed engine trouble and had to be diverted to Spain.  Another excuse was that an un-named Angolan general had to be "paid-off" before the diamonds would be released.  As of December 1, 2010, Investor #1 had been unable to recoup the remaining $71,000 of his investment.

40. In a telephone conversation in approximately November, 2010, the Daltons falsely claimed to Investor #1, "[t]he reason investor funds left the country is because the SEC came in and started investigating this whole thing and I was advised to move the money out of the country because if I didn't, they could seize it and it could be six months before you got your money back."

41. Since the time the SEC became involved in the investigation in March of 20l0, there is no documentation or bank analysis which indicates that significant investor funds were transferred overseas.

42. As late as November 12, 2010, the Daltons were still lulling investors by repeatedly telling them to expect funds "soon" and then, after not providing the funds, offered different excuses for why investors had not been repaid.  Many of these excuses dealt with the SEC investigation.  The Daltons also tried to discourage investors from cooperating with the SEC by telling them that if they were cooperating with the SEC, they would not receive their investment funds back.

43. On November 23, 2010, the Honorable Robert E. Blackburn, United States District Court Judge, District of Colorado, whom is presiding over the SEC matter, issued a Temporary Restraining Order, and ordered Richard Dalton to surrender his U.S. Passport to the Clerk of the Court.  Richard Dalton failed to comply, and he and Marie Dalton have purportedly fled to South Africa and have not returned to the United States since sometime in November, 2010.

FINANCIAL ANALYSIS – Purchase of 927 Cole Street, Golden, CO

44. According to the bank account analysis conducted by the SEC, from at least 2008 through August 2010, the Daltons misappropriated investor funds for their personal benefit. The

Daltons used investor money in UCR's bank accounts for the following:

    a.      Payment of $936,000 in cash for a residence;

    b.      Cash distributions of at least $25,000;

    c.      Cosmetic dental work totaling about $35,000;

    d.      Purchase of a Toyota Highlander for approximately $38,000;

    e.      Transfers to his personal checking account totaling $250,000

45.     The analysis regarding some of the items above, including the residence, dental work, and the truck, was confirmed by testimony provided by Marie Dalton at an SEC deposition on October 7, 2010.

46.     Based on information provided by the SEC, in June 2008, UCR entered into a lease/purchase agreement for the residence located at 927 Cole Street in Golden, Colorado and paid approximately $4,000 per month in rent.

47.     In June 2009, the lease/purchase agreement was modified to allow Marie Dalton to purchase 927 Cole Street for $936,000.  Marie Dalton admitted in her SEC deposition that she purchased 927 Cole Street with funds provided by Richard Dalton, and that she has had no income for the past 10 years. Guardian Title Agency handled the closing of the purchase of 927 Cole Street.

48.     During his deposition on June 24, 2010, Richard Dalton testified that his only source of income since 2007 was from his consulting business, UCR.  Richard Dalton claimed that he did not have any other income from investments.  Richard Dalton estimated that he lost money in 2007, broke even in 2008, and made approximately $200,000 in 2009. Richard Dalton also testified that his wife, Marie Dalton, has not been employed since five or six years ago when she worked at a church.

16

49.     A review of the Jefferson County Clerk and Recorder's records reflect a Warranty Deed recorded on September 24, 2009, listing Marie Dalton as the owner of 927 Cole Street. The total consideration paid as reflected in the Warranty Deed was $936,000. The records' search did not identify any encumbrances.

50.     A subsequent bank account analysis of UCR's Bank of America account # XXXXXXXX4794  conducted by IRS-CI reflects that UCR wire transferred $1,000,000 in investors' funds to Arcanum Equity Fund, a hedge fund operated by Robert Buckhannon. The transferred funds consisted of two separate wire transfers of $500,000 each, totaling $1,000,000.

51.     The first $500,000 wire transfer occurred on April 22, 2008. UCR bank records indicate that funds went to Arcanum Equity Fund, LLC's Deutsche Bank account # XXXX1229. The second $500,000 wire transfer occurred on April 23, 2008, and went to the same account at Deutsche Bank.

52.     The computer evidence obtained from the search warrant on the Daltons' residence included a letter dated April 22, 2008, from Mr. Buckhannon addressed to Richard Dalton and UCR written on Arcanum Equity Fund's letterhead regarding an investment. In the letter Mr. Buckhannon instructs Richard Dalton and UCR to wire $1,000,000 to Arcanum Equity Fund's bank account at the Singapore branch of Deutsche Bank and provides the wiring coordinates.

53.     Mr. Buckhannon was interviewed by IRS-CI on April 18, 2011. Mr. Buckhannon confirmed that he was the CEO and part owner of Arcanum Equity Fund, LLC. Arcanum Equity Fund had accounts with Deutsche Bank in Singapore and Buckhannon was an authorized signor on the account.

54.     Mr. Buckhannon advised that the Daltons and UCR were his clients and he recalled that UCR had transferred $1,000,000 to the Singapore bank account for the purpose of investing in his hedge fund sometime in 2008.

55.     Mr. Buckhannon advised that Arcanum Commodities Group Inc. was a BVI (British Virgin Islands) entity that was formed in order to establish foreign bank accounts in Switzerland. Arcanum Commodities Group, Inc. was wholly owned by Arcanum Equity Fund, LLC, and held bank accounts with the Zurich, Switzerland branch of Landesbank Lichtenstein. Mr. Buckhannon is an authorized signor on the Swiss bank account.

56.     Mr. Buckhannon further advised that he would routinely transfer funds between Arcanum Equity Fund's Singapore bank account and Arcanum Commodities Group's Swiss bank account.

57.     Mr. Buckhannon recalled that the Daltons had requested a return of funds from the Arcanum Equity Fund in order to purchase a residence in Colorado. Mr. Buckhannon would have authorized the wire transfer of funds from the Swiss Bank account to the title company in Colorado.

58.     Records obtained from Guardian Title Agency reflect a wire transfer received on July 2, 2009, in the amount of $910,298.08 ($910,356.44 less wire fee charges $58.36) from an account in the name of Arcanum Commodities Group, Inc. from Landesbank Liechtenstein that was used towards the purchase of 927 Cole Street.

59.     The computer evidence obtained from the search warrant on the Daltons' residence included an Arcanum Equity Fund statement of account for UCR dated July 31, 2009 reflecting a beginning of month balance of $1,540,251.52 and a partial redemption withdrawal in the amount of $910,356.44.


FINANCIAL ANALYSIS – Purchase of 2008  Toyota Highlander

60.     The bank account analysis of UCR's Bank of America account # XXXXXXXX4794 conducted by IRS-CI reflects that Richard Dalton signed check # 1188 dated August 28, 2008, made payable to Burt Toyota in the amount of $37,971.51. The back side of the cancelled check contained a stamped endorsement "For Deposit Only Burt Toyota Scion, Inc. [XXXXXX]6235." The check cleared UCR's account on September 4, 2008. The source of funds for this check was UCR investor funds that had accumulated in the account.

61.     In Marie Dalton's SEC deposition on October 7, 2010, Marie Dalton explained that check # 1188 made payable to Burt Toyota was used to purchase a 2008 Toyota Highlander. Marie Dalton advised that the vehicle was titled in the name of UCR and that Richard Dalton drove the vehicle.

62.     A State of Colorado Department of Motor Vehicles registration check as of July 28, 2011, reflects that a 2008 Toyota Highlander 4 Door Wagon Sport Utility, VIN # JTEES42A182076495, License Plate # 325RLP is currently registered to UCR with the address of 927 Cole Street, Golden, Colorado.

63.     A copy of a Certificate of Origin for a Vehicle # T005254875  dated April 26, 2008 (i.e. original vehicle title), was obtained from the State of Colorado Department of Motor Vehicles. Listed on the vehicle title was Vehicle Identification Number  -JTEES42A182076495, Year – 2008, Make – Toyota, Series or Model – Highlander LTD, Name of Distributor/Dealer – Burt Toyota Scion, Inc. The back of the vehicle title reflects a transfer of title from Burt Toyota Scion, Inc. to Universal Consulting Resources LLC.

64.     A State of Colorado Department of Motor Vehicles title search reflects as of May 18, 2011 that VIN # JTEES42A182076495 is owned by Universal Consulting Resources LLC

19

and has a corresponding Colorado Plate # 325RLP. The title search reflects that there are no current lienholders.

65.     During the execution of the search warrant of the Daltons' 927 Cole Street residence on December 17, 2010, law enforcement agents identified a red Toyota Highlander, Colorado license plate # 325RLP, parked inside the garage of the residence. Agents photographed the VIN sticker located on the side of the door of the vehicle. The VIN # captured in the photograph was JTEES42A182076495.

<u>CONCLUSION</u>

66.     Title 18 United States Code, Section 981(a)(1)(C) provides for the forfeiture of, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of ...any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) or a conspiracy to commit such offense."

67.     Title 18, United States Code, Section 1956(c)(7), in turn, identifies, as specified unlawful activity, any act or activity constituting an offense listed in section 1961(1) - a list which includes violations of 18 U.S.C. Sections 1341 (mail fraud), 1343 (wire fraud) and 2314 (transportation of stolen property).

68.     Based on the above information, your Affiant has probable cause to believe that the Daltons used funds traceable to their mail and wire fraud scheme to purchase 927 Cole Street and the 2008 Toyota Highlander (VIN # JTEES42A182076495), and therefore, both are subject to forfeiture and seizure pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and (b)(2).

69.     Further, Title 18 United States Code, Section 981(a)(1)(A) provides for the forfeiture of, "[a]ny property, real or personal, involved in a transaction . . . in violation of

20

section . . . 1956. . . of this title, or any property traceable to such property."

70.     As described above, there is probable cause to believe that the Daltons and UCR engaged in a financial transaction in criminally derived property (mail and wire fraud proceeds) when they purchased 927 Cole Street and titled it in Marie Dalton's name knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and further knowing that the financial transaction was designed in whole and in part to conceal and disguise the nature, source, ownership, and control of the proceeds of the specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). In addition, 927 Cole Street was "property involved" in the transaction by virtue of the related warranty deed that was "exchanged" for the SUA proceeds; thus, the real property known as 927 Cole Street is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A).

71.     Further, Title 18 United States Code, section 981(a)(1)(A) provides for the forfeiture of, "[a]ny property, real or personal, involved in a transaction . . . in violation of section . . . 1957. . . of this title, or any property traceable to such property."

72.     As described above, the Daltons engaged in monetary transactions involving more than $10,000 in criminally derived property (mail and wire fraud proceeds) when they purchased 927 Cole Street and the 2008 Toyota Highlander, in violation of Title 18, United States Code, Section 1957.

VERIFICATION OF TED K. LAIR,
INTERNAL REVENUE SERVICE-CRIMINAL INVESTIGATION SPECIAL AGENT

I, Ted K. Lair, hereby state and aver that I have read the foregoing Factual Basis for

Forfeiture, and that the facts and information contained therein are true.

/s/Ted K. Lair_____
Ted K. Lair, Special Agent
Internal Revenue Service-Criminal Investigation


STATE OF COLORADO              )
CITY AND                       ) ss.
COUNTY OF DENVER               )

The foregoing VERIFIED COMPLAINT FOR FORFEITURE IN REM was sworn to

and subscribed before me this 11th day of August, 2011, by Ted K. Lair, Internal Revenue

Service-Criminal Investigation Special Agent.

/s/Pamela S. Jebens_____
Notary Public, State of Colorado

My Commission Expires: 3/19/2012

CLAIM FOR RELIEF

73.     The Plaintiff repeats and incorporates by referent each of the paragraphs above.

74.     By the foregoing and other acts, 927 Cole Street is proceeds of a violation or

violations of 18 U.S.C. § 1341, 1343 and 2314 and therefore is forfeitable to the United States

pursuant to 18 U.S.C. § 981(a)(1)(C).

75.     By the foregoing and other acts, 927 Cole Street is proceeds of a violation or

violations of 18 U.S.C. § 1956 and 1957 and therefore is forfeitable to the United States pursuant

to 18 U.S.C. § 981(a)(1)(A).

76.     By the foregoing and other acts, the 2008 Toyota Highlander is proceeds of a violation or violations of 18 U.S.C. § 1341, 1343 and 2314 and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

77.     By the foregoing and other acts, the 2008 Toyota Highlander is proceeds of a violation or violations of 18 U.S.C. § 1956 and 1957 and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States prays for entry of final order of forfeiture for defendant property in favor the United States, that the United States be authorized to dispose of the defendant property in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant property.

DATED this 11th day of August, 2011.

Respectfully submitted,

ERIC HOLDER
Attorney General of the United States

BARRY R. GRISSOM
United States Attorney

/s/Richard L. Hathaway
RICHARD L. HATHAWAY #07767
Special Attorney
444 S.E. Quincy, Suite 290
Topeka, KS 66683-3592
Tel: 785-295-2850
Fax: 785-295-2853
rich.hathaway@usdoj.gov

/s/Christine E. Kenney
CHRISTINE E. KENNEY #13542
Special Attorney
christine.kenney@usdoj.gov