IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-00430-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

2.   MARIE DALTON,

    Defendant.

## PLEA AGREEMENT

The United States of America (the government), by and through Christine E. Kenney and Richard L. Hathaway, Special Counsel for the District of Colorado, and the defendant, Marie Dalton, personally and by counsel, Thomas E. Goodreid, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1 and Fed. R. Crim. P. 11(c)(1)(B). It is a condition of this Plea Agreement that the Court accept the terms of the Plea Agreement between co-Defendant Richard Dalton and the government. Should the Court reject that Plea Agreement, Defendant Marie Dalton shall have the right to withdraw her guilty plea under this Plea Agreement.

### I. AGREEMENT

The defendant agrees to plead guilty to Count One of the Indictment, charging a violation of 18 U.S.C. § 371, Conspiracy to Commit Mail Fraud, Wire Fraud, and Money Laundering. The defendant does so knowingly and voluntarily. In return, at the time of





sentencing, the government agrees to dismiss Counts Two through Nineteen of the Indictment pending against the defendant. This plea agreement is submitted pursuant to Fed.R.Crim.P. 11(c)(1)(A) and (c)(1)(B).

The government agrees that, provided the defendant does nothing inconsistent with her acceptance of responsibility between the entry of her plea of guilty and sentencing, it will file a motion seeking a three (3) level reduction in the offense level based on acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b).

## II. ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of the offense to which this plea is being tendered are as follows:

The elements of Conspiracy in violation of 18 U.S.C. § 371 are:

A. the defendant agreed with at least one other person to violate the law.

B. one of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

C. the defendant knew the essential objective of the conspiracy.

D. the defendant knowingly and voluntarily participated.

E. there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

## III. STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 371 is: not more than 5 years (60 months) imprisonment; not more than $250,000 fine, or both; not more than 3 years supervised release; $100 special assessment fee; plus restitution and

forfeiture as described below.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense[s] of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is on or about 2007.

The parties agree as follows:

3

The defendant, Marie Dalton, at all times relevant to the charges in the Indictment, was married to her co-defendant in this case, Richard Dalton. Beginning in 2007, and continuing through 2010, the Daltons' primary source of income was from a company founded by Richard Dalton based in Golden, Colorado, called Universal Consulting Resources LLC ("UCR"), a limited liability company formed in New Mexico. Richard Dalton operated UCR from his residence at 927 Cole Street in Golden, Colorado (the "Cole Street Property"). UCR also used a UPS box, located at 14405 W. Colfax Ave., Suite 292, Golden, Colorado.

Through UCR, the Daltons solicited investors to purchase interests in investment contracts, generally referred to as either the "Trading Program," or the "Diamond Program." The Trading Program began in approximately 2007, and the Diamond Program began in approximately 2009. Investors signed the UCR "Investment Structure Agreement," which stated that investors' money would be placed into an escrow account, and transferred as necessary to UCR trading accounts, and that the escrow account would be used to receive profits from investments.

For both the Trading Program and Diamond Program, investors were guaranteed a specific monthly return. The Daltons told investors that the investment contracts were extremely low risk. In addition, the Investment Structure Agreement stated, "UCR, LLC account management is re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions." The Investment Structure Agreement also provided, "[a]n Investor can cancel this Agreement at any time and request that all money as principal investment and all other proceeds from profits be returned." The Investment Structure Agreement for the Diamond Program was nearly

identical to that of the Trading Program, except that the definition of "Financial Instruments," to be traded for profit, was expanded to include "precious stones."

Investor funds were deposited into UCR's Bank of America account # XXXX XXXX 4794, located in New Mexico, and checks for purported profit payments back to investors were written on this account. Both Richard Dalton and Marie Dalton had signatory authority over the UCR bank account, and were both "Member/Managers" of UCR.

Investors from thirteen states and five foreign countries invested approximately $17,000,000 in UCR. The Daltons made false statements to these investors, including: returns were guaranteed, typically in the range of 48 to 120% annually; returns would be paid monthly from profitable international note trading and diamond trading; the UCR investment programs were extremely low risk; investors' money could be returned at any time; UCR accounts were evaluated by top professional and licensed Third Party services; and, the invested funds would be held safely in an escrow account at a bank in the United States, and that a European trader (often referred to simply as "the Trader," but never known or referred to by name), would use the value of that account, but not the actual funds, to obtain leveraged funds to purchase and sell bank notes. Richard Dalton and Marie Dalton both told some investors that the UCR investment programs were extremely low risk. These statements were false. UCR was operated as a classic Ponzi scheme, wherein investor funds were commingled and used to pay out purported profits to early investors to create the false appearance that the investments were performing as promised.

At times, Marie Dalton performed bookkeeping duties for UCR, and participated

in recruiting investors. Along with her husband, Richard Dalton, Marie Dalton engaged in discussions with potential investors regarding the investments. Marie Dalton established the email account to which investors were directed to send investment questions.

The Daltons used investor funds to pay personal expenses. For example, Richard Dalton caused the wire transfer of $910,000 of UCR investor funds to purchase the Cole Street Property in Marie Dalton's name. Originally, UCR was the purchaser, but the contract was transferred from UCR to Marie Dalton. Also, Marie Dalton wrote checks on the UCR bank account, and drafted a check from this account to Burt Toyota to purchase a 2008 Toyota Highlander registered to UCR. Marie Dalton drafted some of the checks for payment to UCR investors, and Richard Dalton signed the checks. Marie Dalton indicated on some of these checks an amount remaining. Marie Dalton also drafted a $35,000 check to Wheat Ridge Dental for payment of Richard Dalton's dental work. All the deposits into the UCR bank account came from investor payments.

Marie Dalton purchased the Cole Street property with funds Richard Dalton transferred from the UCR bank account to Arcanum Commodities Group, where the funds were deposited into an account at a foreign financial institution. On April 22, 2008, Richard Dalton transferred $500,000 from the UCR Bank of America account # XXXX XXXX 4794 to Deutsche Bank account # XXXX1229, located in Singapore. On April 23, 2008, Richard Dalton transferred another $500,000 from the UCR Bank of America account # XXXX XXXX 4794 to the same Deutsche Bank account # XXXX1229. On July 2, 2009, the Daltons caused $910,298.08 of the UCR investor funds to be transferred from Liechtensteinische Landesbank, located in Zurich,

6

Switzerland, into the State of Colorado for the purpose of purchasing the Cole Street property.

The Daltons' family members received substantial payments from the UCR bank account. One of the Dalton's daughters received $118,050 and another of the Daltons' daughters received $286,660. Payments from the UCR bank account to Dalton family members totaled $660,710, compared to $173,000 in payments from family members to UCR. Neither Richard Dalton nor Marie Dalton made any payments to UCR.

In 2010, upon learning that Richard Dalton and UCR were under investigation by the Securities and Exchange Commission, an entity of the United States whose mission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation the Daltons discontinued making purported profit payments to investors– which were in fact simply commingled funds of new investors– and commenced lulling activities, including but not limited to:

A. falsely representing to investors that they should expect funds soon;

B. falsely representing to investors that "the Trader" UCR was using had to switch banks causing delays;

C. falsely representing that investors could request a return of their investment and the request would be honored in accordance with the agreement, ultimately representing that UCR would return investor funds on or before August 2010; and

D. falsely representing in September 2010, that UCR was liquidating a cache of diamonds to pay investor funds back, but that a plane carrying the diamonds had the number three engine go out and had to land in Amsterdam; that among 50,000 carats

7

were 18,000 fake diamonds; and other fraudulent lulling statements. On August 20, 2010, Marie Dalton left an outgoing message on the UCR voice mailbox for investors representing that checks were going out soon in the order of an investors' contribution to the programs, and promised that everyone would be repaid in the next two to three weeks.

On 8/25/2010 the SEC attempted to depose Richard Dalton concerning his and Marie Dalton's activities related to UCR. Richard Dalton mostly refused to answer questions, asserting his Fifth Amendment right. On October 7, 2010, the SEC deposed Marie Dalton concerning her and her husband's activities related to UCR. At times, Marie Dalton declined to answer questions on the basis of spousal communications privilege and on the basis of a vicarious assertion of her husband's Fifth Amendment right.

On November 16, 2010, the SEC filed formal action against Richard Dalton and UCR in the District Court of Colorado and documents were served on the Daltons the same date. On November 20, 2010, the Daltons left together from the United States for South Africa. Between October 15, 2008, and April 1, 2010, Richard Dalton had transferred from the UCR bank account $787,525 of investor funds to accounts both overseas and domestic, controlled by Henry Anthony Montgomery, a friend of the Daltons. The Daltons remained in South Africa until they were detained by South African authorities on September 28, 2011 and forced to return to the United States where they were arrested in Atlanta, Georgia, on September 30, 2011, on federal warrants related to the instant indictment.

The parties agree that the net loss resulting from the defendant's conduct as set

8

forth above is more than $2.5 million and less than $7 million.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. §3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute. The parties have relied upon the 2012 U.S.S.G. Manual.

    A.    The base guideline is § 2B1.1(a)(2) with a base offense level of 6.

    B.    The following specific offense characteristics apply pursuant to § 2B1.1(b):

        1.    An 18-level increase applies under § 2B1.1(b)(1)(J) because the loss is more than 2.5 million but less than 7 million.

        2.    A 4-level increase applies under § 2B1.1(b)(2)(B) because the offense involved 50 or more but less than 250 victims.

        3.    A 2-level increase applies under § 2B1.1(b)(10)(A) and (C) because the offense involved sophisticated means. NOTE: The defendant reserves the right to contest the application of this two-level enhancement.

    C.    There are no victim-related or multiple count adjustments.

9

D. The adjusted offense level therefore would be 30.

E. The defendant should receive a 3-level decrease for acceptance of responsibility under §§ 3E1.1(a) and (b). The resulting offense level therefore would be 27.

F. The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

G. The career offender/criminal livelihood/armed career criminal adjustments would not apply.

H. The advisory guideline range resulting from these calculations is 70 - 87 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 70 months (bottom of Category I) to 162 months (top of Category VI). The guideline range would not exceed, in any case, the statutory maximums applicable to the count of conviction.

I. Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $12,500 to up to the maximum authorized by statute, see U.S.S.G. § 5E1.2(c)(3), plus applicable interest and penalties.

J. Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least one but not more than 3 years because the Count of conviction is a Class D felony.

K.   <u>Forfeiture of Assets</u>.  Defendant Marie Dalton agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to:

1. a money judgment in the amount of $5,___,___.00, which sum represents the amount of proceeds obtained as a result of the conspiracy to commit/scheme to commit mail and wire fraud;

2. a 2008 Toyota Highlander Ltd., VIN JTEES42A182076495;

3. 927 Cole Street, Golden, Colorado;

4. one Webber OM Guitar with case S/N 2310, seized from Richard and Marie Dalton on September 30, 2011; and

5. one 1.05 Carat diamond, currently part of a 14KT Yellow Gold ring, seized from Marie Dalton on September 30, 2011. The parties understand that, in order to return the 14KT Yellow Gold ring without the 1.05 Carat diamond, Marie Dalton will incur the costs to have a qualified jeweler extract the stone.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have.

The United States agrees not to pursue forfeiture of 14706 Columbine Street, Brighton, Colorado through any civil or criminal forfeiture action related to the conduct

11

described in the Factual Basis.

The defendant admits and agrees that the conduct described in the Factual Basis above provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which defendant is pleading guilty. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

Defendant further agrees to take all steps necessary to pass title to the United States. These steps include, but are not limited to; the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers. To that end, defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, as described above wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

The defendant agrees that the United States is not limited to forfeiture of the property described above. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall be entitled to forfeiture of any other property (substitute assets)

of the defendant up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e). This Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. The United States Attorney's Office for the District of Kansas, as special counsel, will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws. The defendant understands that the United States Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

L.   The Court shall order restitution to the victims of the offenses charged not only in Count One, the count of conviction, but also in the remaining counts of the Indictment.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party

from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. §3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 02·08·13

*Marie Dalton*
Marie Dalton
Defendant

Date: 2-8-13

*Thomas E. Goodreid*
Thomas E. Goodreid
Attorney for Defendant

Date: 2-21-2013

*Christine E. Kenney*
Christine E. Kenney
Special Counsel

Date: 2.21.13

*Richard L. Hathaway*
Richard L. Hathaway
Special Counsel

15