UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. **'10 - CV - 0 2 7 9 4 JLK-KLM**

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2010 NOV 16   AM 11: 55

GREGORY C. LANGHAM
CLERK

BY _____ DEP. CLK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

v.

RICHARD DALTON, and
UNIVERSAL CONSULTING RESOURCES LLC,

                    Defendants,

and

MARIE DALTON,

                    Relief Defendant.

---

## COMPLAINT

---

Plaintiff, United States Securities and Exchange Commission ("SEC"), states and alleges as follows against Defendants Richard Dalton ("Dalton") and Universal Consulting Resources LLC ("UCR") and against Relief Defendant Marie Dalton:

### SUMMARY OF THE CASE

1.    This case involves a Ponzi scheme that fraudulently raised about $17 million from at least 130 investors in 13 states since 2007, through the sale of unregistered securities. Defendants Dalton and UCR lured investors by guaranteeing investment returns typically in the range of 48 to 120% annually.  Dalton and UCR claimed that these returns would be paid monthly from profitable international note trading and diamond trading.  Dalton and UCR also told investors that the investments were "extremely low risk" and that their money could be returned at any time.

1



2.      In classic Ponzi scheme fashion, early investors were paid the exorbitant returns guaranteed by Dalton and UCR, and about $10 million in "profit" payments were made to investors.  But at least a significant portion – if not the vast majority – of these payments were from other investor funds, not profitable ventures.  Beyond using them to pay investors' returns, Dalton also used investor funds to pay for his lifestyle, including a nearly $1 million home, a new car, cosmetic dental surgery, cash withdrawals, and his daughter's wedding.

3.      In March and April of 2010, Dalton and UCR stopped providing the purported "profit" payments to investors, and their scheme began to collapse.  From that time until at least November 12, 2010, Dalton and UCR have made false and misleading statements to investors to try to lull them into complacency and delay the disclosure of their fraudulent scheme.

4.      Dalton and UCR intentionally deceived investors into buying their securities through numerous misrepresentations and omissions of material fact.  Dalton and UCR lied by claiming that their securities would pay high rates of return based on low risk, profitable trades, when in fact they were operating a Ponzi scheme.  Dalton and UCR violated the anti-fraud provisions of federal securities laws, Dalton acted as an unregistered broker-dealer in actively soliciting investors to purchase securities – and commissioning finders and brokers to do the same – and Dalton and UCR offered and sold securities in violation of the registration provisions of the federal securities laws.

5.      The SEC brings this civil enforcement action seeking preliminary and permanent injunctions, disgorgement plus prejudgment and postjudgment interest, and civil penalties for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 10(b) and 15(a) of the Securities Exchange Act of

1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)]; and Rule 10b-5 [17 C.F.R. §240.10b-5].

## JURISDICTION AND VENUE

6.      The Court has jurisdiction pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§ 77t(b) and 77v(a)], and Exchange Act Sections 21(d) and (e), and 27 [15 U.S.C. §§ 78u(d) and (e) and 78aa].

7.      In connection with the acts described in this Complaint, the Defendants have used the mails, other instruments of communication in interstate commerce, and means or instrumentalities of interstate commerce.

8.      Venue lies in this Court pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b)(1) & (2).  During the period of conduct alleged herein, UCR maintained offices in Golden, Colorado and Dalton and his wife Marie Dalton are residents of Golden, Colorado.  Further, Dalton and UCR engaged in the offer and sale of securities in the District of Colorado, and many of the acts and practices described in this Complaint occurred in the District of Colorado.

## DEFENDANTS

9.      **Richard Dalton** resides in Golden, Colorado and is the Director of Finance, managing director, and sole employee of UCR.

10.     **Universal Consulting Resources LLC** is a New Mexico limited liability company that operates out of Dalton's home at 927 Cole Street in Golden, Colorado.

## RELIEF DEFENDANT

11.     **Marie Dalton** resides in Golden, Colorado and owns a residence located at 927 Cole Street in Golden, Colorado that was purchased with money provided to UCR by investors.

## FACTUAL BACKGROUND

### I.      Dalton and UCR's Offer and Sale of Interests in Investment Contracts

12.      Dalton is the managing director and sole employee of UCR, which was incorporated in 2007.  For the past three years, Dalton has had no source of income other than UCR.

13.      From about March 2007 through at least about June 2010, Dalton and UCR solicited investors to purchase interests in investment contracts, which were securities.  Dalton generally referred to the investment contracts as either the "Trading Program," which Dalton and UCR began offering in about March 2007, or the "Diamond Program," which Dalton and UCR began offering in early 2009   Investors typically learned about UCR's investment programs from "finders" or "brokers" who were paid commissions by UCR, or from earlier investors who had received what they believed to be monthly distributions of profits from UCR, some of whom also received commissions for bringing in new investors.  According to one investor, "[a]s a result of the consistent returns from this investment, I started telling my friends and family about the investment I had made with Dalton.  My friends and family started meeting with Dalton and some of them eventually invested with Dalton."  Some investors invested funds from their self-directed IRA retirement accounts.

14.      For both the Trading Program and Diamond Program, the "finders" and "brokers" provided Dalton's contact information to potential investors and instructed potential investors to contact Dalton directly for information about the Trading and Diamond Programs.  Dalton and UCR typically solicited investors and provided information by e-mail, by meeting with potential investors in person, or by talking to them on the telephone.  Dalton and UCR took no steps to assure that the offering and sale of the investment contracts were directed to only a small number

of sophisticated investors and, in fact, took no steps to determine potential investors' net worth, or that investors had the knowledge, experience, or business acumen to qualify as sophisticated or accredited investors.

15.     As part of soliciting investors for the Trading Program, Dalton and UCR falsely told prospective investors that their invested funds would be held safely in an escrow account at a bank in the United States, and that a European trader (often referred to simply as "the Trader," but never known or referred to by name) would use the value of that account, but not the actual funds, to obtain leveraged funds to purchase and sell bank notes.   According to Dalton, the trading was profitable enough that he was able to *guarantee returns of four to five percent per month – or 48 to 60% per year* – to investors.  Some investors were guaranteed higher rates of return, including one investor who was *guaranteed returns of 75 to 80% per month – or 900 to 960% per year*.  Dalton claimed that he had successfully been running the Trading Program for nine years.

16.     Dalton and UCR did not provide current or prospective investors with material, accurate information about UCR's finances or about the profits and losses of the investment contracts that UCR purported to sell.  Dalton and UCR also did not provide current or prospective investors with an audited balance sheet for UCR, the Trading Program, or the Diamond Program, or any other accurate, material financial disclosures.  Instead, as described below in paragraphs 36 through 41, Dalton withheld crucial information.

17.     Dalton and UCR required investors to sign an "Investment Structure Agreement," which he would often transmit by facsimile or e-mail, and which represented that investors' money would be placed into an escrow account, and transferred as necessary to UCR trading

accounts.  The Investment Structure Agreement for the Trading Program stated that the trading accounts would serve as collateral to allow for profitable trading of financial instruments:

> The purpose of this Investment Structure Agreement shall be to enter into a Trading Agreement with various financial institutions as determined by UCR, LLC, to generate profits from the Trading of Financial Instruments of which UCR, LLC will distribute profits of 5% per month to the Investors.  Distribution of profits is to be made monthly.

18.     For both the Trading Program and Diamond Program, Dalton and UCR guaranteed a specific monthly return for each investor and claimed that the investment contracts had "extremely low risk."  In addition, the Investment Structure Agreement stated that "UCR, LLC account management is re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions."

19.     The Investment Structure Agreement stated that investors' money could be returned at any time: "An Investor can cancel this Agreement at any time and request that all money as principal investment and all other proceeds from profits be returned."

20.     In order to purchase an interest in an investment contract, the Investment Structure Agreement required investors to state that that they were not affiliated with a "government entity or regulatory agency at any level as an informant," that they were not solicited by Dalton or UCR, and that federal securities laws did not apply to the investments.

21.     Dalton and UCR claimed that the Diamond Program would earn investors profits by trading in diamonds.   The Investment Structure Agreement for the Diamond Program was generally nearly identical to that of the Trading Program, except that it defined the "Financial Instruments" (which were to be traded for profit) to include "precious stones," and *guaranteed a ten percent monthly return – or 120% yearly return* – on trading transactions.  Some, but not

all, of the Diamond Trading Program agreements also more particularly described their purpose as:

> [T]o enter into a Trading Agreement with various providers and resources as determined by UCR, LLC, to generate profits from the trading (buying and selling) of uncut or cut diamonds from which UCR, LLC will distribute profits of 10% to the Investors per completed transaction (or turn) with at least one completed transaction estimated per month.

22.     Dalton and UCR did not keep investors' funds separate by Program, but instead pooled the funds in various bank accounts.

23.     Investors in the Trading and Diamond Programs did not have any duties or management roles in the operation of the Programs.

24.     Given that Dalton was UCR's sole employee, he was solely responsible for the development and implementation of the Trading and Diamond Programs.  He engineered and operated the purported trades that were to generate profits in the Programs, managed the purported Programs, accepted and invested investors' funds, and provided purported updates on the progress of the Programs to prospective and current investors.  He was also the sole person responsible for ensuring that investors' funds were safeguarded and returned to them and that UCR sent out investors' profit payments as promised in the Investment Structure Agreements.

**II.     The Ponzi Scheme**

25.     Dalton and UCR's Trading Program and Diamond Program were Ponzi schemes. UCR's bank records demonstrate that at least $5 million of the approximately $10 million in purported profit payments were made from investors' funds that were provided to UCR for investment in the Trading and Diamond Programs.

a.   Lack of Actual Profits

26.     As detailed above, Dalton and UCR represented to investors that the money raised through the sale of interests in the Trading and Diamond Programs would be used as collateral to fund note or diamond trading, typically resulting in profits of between four to ten percent per month (or 48 to 120% per year), though sometimes as high as 75 to 80% per month (or 900 to 960% per year).  Prior to filing this lawsuit, the SEC conducted an investigation of UCR and Dalton and, as part of the investigation took Dalton's sworn testimony on August 25, 2010. Dalton refused to answer the following questions:

Q   Has UCR earned a profit in any year between 2007 and 2010?

Q   How much revenue has UCR earned between 2007 and 2010?

Q   Is it true that you currently have insufficient money to repay investors the outstanding principal and returns they are owed in the [Trading Program]?

Q   Is it true that some of the money that you raised for the [Trading Program] was used to repay other investors rather than being invested in foreign . . . notes?

Q   Is it true that some of the money you raised for the [Trading Program] was used for your own personal benefit to cover your personal expenses instead of for the benefit of that investment?

Q   Is it true that the foreign note investment was a Ponzi scheme?

Q   Is it true the mid-term note investment was a Ponzi scheme?

Q   Did UCR ever buy any diamonds?

Q   Have you ever bought any diamonds?

Q   Has any investor money ever been used as collateral for the purchase of diamonds?

Q   Have you ever engaged a bank to purchase diamonds?

Q   Do you currently have any diamonds in your possession?

Q   Do you have diamonds at your home?

Q   Do you any diamonds in storage?

Q   Have you moved diamonds to a foreign country?

Q   Have you ever made any profit from the diamond investment business?

Q   Isn't it true that the diamond program is a Ponzi scheme?

27.     During its investigation, the SEC also issued document subpoenas to UCR and Dalton, which required UCR and Dalton to provide the following documents to the SEC:

All documents relating to any investments made by UCR.

All documents relating to any income and/or revenue UCR has earned.

All documents relating to any diamond business UCR has operated, advised, managed, offered, marketed, recommended, and/or promoted as an investment.

All documents relating to any mid-term note investment that UCR has operated, advised, managed, offered, marketed, recommended, and/or promoted as an investment.

28.     Dalton produced no documents to the SEC.  He provided no evidence that the Trading Program and Diamond Program were legitimate investment programs.  UCR did not produce a single accounting record.  It  produced one three-page "UCR Payout Summary" that contained only client names, a column entitled "amount" that contained a dollar amount, and a third column entitled "check #" that did not contain check numbers but did contain, in a few instances, a dollar amount.  The list did not contain investors' addresses, did not indicate the percent return guaranteed to the investor, did not indicate whether the investor had invested in the Trading Program or the Diamond Program, and did not indicate the amount of funds received or date of funds received from the investor.  UCR produced virtually no evidence that Dalton used the funds provided by investors for the purposes set out in the Investment Structure

Agreement.  UCR did not produce a single document related to income or revenue that UCR had earned.  It did not produce a single document that substantiated any profit from any note investment that UCR had operated, advised, managed, offered, marketed, recommended, and/or promoted as an investment.

29.     UCR and Dalton did not maintain the types of investor records that would be expected to be maintained by a legitimate company that was in the business of calculating and remitting monthly profit payments to investors.  For example, UCR did not maintain a complete list or schedule identifying investors, investors' contact information, dates or amounts of funds received from investors, profit payments made to investors, or any other types of schedules that would be needed to make proper and timely payments to investors under the Investment Structure Agreement.

b.   Ponzi Payments to Investors

30.     Dalton and UCR raised approximately $17 million from investors and made monthly payments to investors from at least 2008 through about April 2010, as evidenced by UCR's bank records.  For example, one investor placed $25,000 in the Trading Program in June 2009 and received monthly five-percent interest payments ($1,250 each) from August 2009 until July 2010.  The same investor then placed $70,000 in the Diamond Program in September 2009, and received two ten-percent interest payments ($7,000 each) thereafter.  Other investors received monthly interest payments on their investments until March or April 2010.  Investors understood from Dalton that these payments reflected profits from either the Trading Program or the Diamond Program.

31.     Ultimately, however, the vast majority of funds that came into UCR were from investor money, not from any actual profit-generating activity.  The bank records show that

investors received at least $5 million in Ponzi payments, that is, payments from funds provided by other investors, between 2008 and 2010.

**III.**    **Dalton's Misappropriation of Investor Funds**

32.    From at least 2008 through August 2010, Dalton misappropriated investor funds for his personal benefit.  Dalton used UCR's bank accounts – with investor money – to misappropriate the following:

- payment of $936,000 in cash for a residence;

- cash distributions of at least $25,000;

- cosmetic dental work totaling about $35,000;

- purchase of an approximately $38,000 Toyota truck;

- a deposit for his daughter's wedding totaling over $5,000; and

- miscellaneous living expenses.

33.    Numerous other withdrawals and transfers do not have an obvious business purpose, and may represent significant additions to the amount of funds misappropriated by Dalton.

34.    Dalton's misappropriations benefitted relief defendant Marie Dalton and were used to purchase a residence.  In June 2008, UCR entered into a lease/purchase agreement for a residence located at 927 Cole Street in Golden, Colorado ("the Cole Street Property"), and paid approximately $4000 per month in rent.  The Daltons live in that residence.  In June 2009, the lease/purchase agreement was modified to allow Marie Dalton to purchase the Cole Street Property for $936,000 and the transaction was accomplished by making a cash payment of $936,000.  Marie Dalton purchased the Cole Street Property with funds provided by Dalton. Bank records show that UCR transferred over $1.2 million in investors' funds to Arcanum

11

Equity Fund, and that Arcanum Commodities Group Inc. later transferred $910,356.44 to Guardian Title Agency, LLC for the purchase of the Cole Street Property from a bank account in Liechtenstein.

### IV.    Misrepresentations and Acts of Fraud and Deceit

35.    As a part of the Ponzi scheme, Dalton and UCR made numerous false and misleading statements about UCR and the Trading and Diamond Programs and engaged in acts of fraud and deceit on prospective and existing investors.  Perhaps most critically, Dalton never disclosed to investors that a significant amount of "profit" payments were actually just payments made from new investors' funds, making the Trading Program and Diamond Program Ponzi schemes.

36.    With respect to the Trading Program, Dalton and UCR falsely claimed that:

- The Trading Program would generate profits from the trading of financial instruments.

- The Trading Program would result in a guaranteed minimum gross profit margin per month of four or five percent.

- The Trading Program had "extremely low risk."

- UCR account management was re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

- Investors' money could be returned at any time.

- Investors' money would be held in escrow in the United States and never used or transferred to another account.

- Investors' money would be used as leverage to buy and sell bank loans.

- The Trading Program was an overnight foreign lending program between banks.

- Dalton worked with an overseas trader who performed the trading.

- Dalton had been successfully running the Trading Program for nine years.

- Investors' money would be completely safe.

37.     In fact, those claims were false because:

- The Trading Program did not generate any significant profits from the trading of financial instruments.

- The Trading Program did not result in a gross profit margin per month of four or five percent, as it did not generate any significant profits.

- The Trading Program had extremely high risk.

- UCR account management was not re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

- Investors' money could not be returned at any time, due to insufficient funds.

- Investor's money was not held in escrow in the United States and was used and transferred to other accounts.

- Investors' money was not used as leverage to buy and sell bank loans.

- The Trading Program was not an overnight foreign lending program between banks.

- Dalton did not work with an overseas trader who generated significant profits from trading.

- Dalton had not been successfully running the Trading Program for nine years.

- Investors' money was not safe.

38.     With respect to the Diamond Program, Dalton and UCR falsely claimed that:

- The Diamond Program would generate profits from the trading of uncut or cut diamonds.

- UCR would distribute profits of ten percent to the investors per completed transaction with at least one completed transaction estimated per month.

13

- Investors' money would be used to purchase diamonds in foreign countries and resell them in the United States.

- The purchased diamonds were insured.

- The Diamond Program would generate profits from the trading of financial instruments, including precious stones.

- The Diamond Program guaranteed a ten percent monthly return on diamond-trading transactions.

- The Diamond Program had "extremely low risk"

- UCR account management was re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

- Investors' money could be returned at any time.

39.    In fact, those claims were false because:

- The Diamond Program did not generate any significant profits from the trading of uncut or cut diamonds.

- UCR did not distribute profits of ten percent to the investors per completed transaction with at least one completed transaction estimated per month.

- Investor's money was not used – or was only used to a limited degree – to purchase diamonds in foreign countries and resell them in the United States.

- There is no evidence that any purchased diamonds were insured.

- The Diamond Program did not generate significant profits from the trading of financial instruments, including precious stones.

- The Diamond Program did not result in a ten percent monthly return on diamond-trading transactions.

- The Diamond Program had extremely high risk.

- UCR account management was not re-enforced by the evaluation of top professional and licensed Third Party services in investment and trade transactions.

- Investors' money could not be returned at any time, due to insufficient funds.

40. Dalton and UCR knew that their statements to prospective and existing investors were materially false or misleading because they knew that: (1) investor payments were not from profitable trading, but rather were made from new investor funds; (2) neither the Trading Program nor the Diamond Program operated or existed as described by Dalton and UCR; (3) neither the Trading Program nor Diamond program generated sufficient profits to pay the claimed investor returns; (4) investors' money was not kept in escrow, but rather was used to pay other investors and for Dalton's home and lifestyle; (5) investors' money was not safe and could not all be returned due to insufficient funds; and (6) Dalton had not successfully run the Trading Program for nine years, but rather operated a fraudulent Ponzi scheme for at least two years. Many of Dalton and UCR's false statements were made by phone, e-mail, facsimile, or through United States mail.

**V.      Dalton's Lulling Activities and Fraudulent Statements about the SEC**

a.   Lulling Activities

41. Dalton and UCR stopped making "profit" payments to investors in the Trading Program and Diamond Program in about March and April 2010. Having learned of the SEC's investigation, beginning in about late June 2010 Dalton promised investors that UCR would return all investor capital. Due to UCR's failure to maintain investor records, it is unclear whether any investors have actually received a return of their capital.

42. Dalton and UCR have made and continue to make numerous verbal and written misrepresentations to investors in response to their requests for profit checks and return of their

capital pursuant to the Investment Structure Agreement.  As late as November 12, 2010, Dalton was still engaged in a pattern and practice of repeatedly telling investors to expect funds "soon," and then after "soon" had passed, providing a different excuse for why investors have not been repaid.

43.      In the first half of June 2010, Dalton told investors in a letter that "[t]here have been some significant changes in the trade program."  Dalton claimed that "the Trader" had to switch from using "Deutche Bank" [sic] to "a prominent Swiss bank" but "was unable to trade from March 20, 2010 until May 17, 2010. . ."  Dalton stated that "regular monthly payments will resume June 15, 2010 and be sent out the 15th of every month thereafter."  As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that there ever was a trader who conducted profitable trades for UCR, or that the purported trader was forced to switch banks for his trades.

44.      On June 17, 2010, Dalton again sent a letter to investors to explain the delay in payments, stating "[t]here is a payment that was due in May that has not been paid and the trader will make every effort to make this up to us during the next 6 months."  Dalton asked the investors to "be patient" but offered that they "can request [their] funds to be returned . . . and [their] request will be honored according to the agreement."  As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that the purported trader ever existed or that he missed a payment or agreed to make up any missed payment.

45.      On June 25, 2010 Dalton again sent a letter to investors, claiming that "[o]ur attorneys have decided that we are currently not totally SEC compliant."  Dalton explained that because "we are no longer able to continue operating under the current business structure, we will be dismantling UCR and discontinuing all operations."  Dalton also indicated that he was

attempting to start a new investment company: "Every attempt is being made to formulate a new company that meets the complexities of the SEC and related agencies." Dalton asked investors to complete a form, indicating how much the investor had invested in the Program, the date of initial investment, and monthly payment amount.

46.     On July 19, 2010, Dalton sent a letter to investors stating that "[t]his will be the last letter addressing the return of your funds that you have entrusted to [UCR]." Dalton explained that prior to issuing refunds, he "committed the funds to the trader for the month of July" in "an effort to create the possibility of one final month's distribution to each of us. . . ." Dalton also stated that he was continuing "to explore any viable options for future restructuring that would comply with federal regulations." Dalton claimed that "we will be returning your funds to you immediately upon completion of the month's transactions on or before the first week of August." As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that UCR committed investor funds to the purported trader for the month of July, or that UCR was attempting to fund another month's purported profit distribution.

47.     On September 15, 2010, after months of lulling investors and stalling payments, Dalton again sent a letter to investors, claiming a delay because of "a dispute between me and the trader. . . ." Dalton said that "[i]n an effort to return your funds sooner we have taken a cache of diamonds that were put aside for this exact purpose and have begun to liquidate them and use the funds to pay your [sic] back." A further delay was purportedly caused because "[o]ur airplane goes to Africa every week to pick up stones . . . [but] had the number three engine go out and had to land in Amsterdam for repair." Additionally, Dalton claimed that once the delayed diamonds arrived in New York, "[m]ixed in with the 50,000 carats were 18,000 fake diamonds." Additionally, "[w]e have been waiting for the African Government to send the 18,000 stones for

over a week." Dalton attempted to calm the investors by saying, "[r]est assured though your funds are safe and you will have them back very shortly." As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence of any dispute with the purported trader, or any evidence that Dalton and UCR owned, rented, or used an airplane for transporting diamonds, transported any diamonds into the country, or received fake diamonds, that any fake diamonds were investigated by the government, or that Dalton and UCR actually conducted the Diamond Trading Program as claimed.

48.    On October 20, 2010, Dalton sent a letter to investors stating that the return of investor funds is "only days from its conclusion." Dalton claimed that "the funds will be released" by "the Trader," and "[c]hecks will be released to you the middle of next week." Dalton also claimed that "we are still active on the diamond front." As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that "the Trader" was about to release investor funds – or even had them in the first place – or that Dalton and UCR ever generated profits from diamond trading.

49.    On October 31, 2010, Dalton sent a letter to investors again stalling payment, claiming that the Trader rejected Dalton's proposed settlement. Dalton also stated that "[m]y partners and I have been involved in a bank trade for the last 11 months. . . .  As soon as the cash is available I have standing instructions to wire enough to my Denver based attorney to pay everyone back." As to the Diamond Program refunds, Dalton asserted that "I also have confidence that the Angolan diamond problem is getting solved the first of the week." Dalton promised, "I will return all your capital so I can remain a man of my word." As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that

Dalton had any partners involved in a bank trade for the past eleven months, or that there was ever an "Angolan diamond problem" that affected Dalton and UCR.

50.     On November 12, 2010, Dalton again updated investors, promising to repay both invested capital and missed profit payments: "I assure all of you no one will lose any money and I intend to pay you for every month that your money has been held up."

51.     Dalton also communicated with investors by telephone to explain the status of their investments.  During those conversations Dalton made the following additional claims:

- The Trader "hasn't  released the depository value on [the investor funds escrow account] yet because he's grinding my chops for what I did to him. . . .  I can go over to -- to Switzerland and sue him in the court system to hurry it up if I wanted to.

- I spent the whole day at the SEC's office at downtown today, and what we're doing is we're going to -- we have already set up the attorney escrow account rather than using UCR because they did a TRO, it's called, on my bank account, temporary restraining order.

- So what I'm doing is refunding everybody the money I brought over -- over 100,000 carats of my diamonds to liquidate and pay everybody back their money.

- We had determined prior to the first amount of money coming who was going to get paid when.  We submitted that to the SEC and to the attorneys and everybody was good with it. . . .  I think you'll find on Friday you'll probably have your check in the mail.

- They're sending out tranches [of investor payments] now, and the first tranche is out.  And the second one is going to go out probably Monday afternoon.  The third will be out Wednesday afternoon. . . .  It's from the first guy in the program to the last, and the SEC asks you to pay the oldest people first and the youngest people last.

- Your money is in the escrow account.  It's still there.  It's never moved.

- I'm going to pay you the profits for every month you were in the program so you're not going to use a dime off your contract.

52.     As part of its investigation, the SEC did not find – and Dalton and UCR did not provide – any evidence that any of these statements was true.  The SEC never prevented Dalton from making distributions and never signed off on any investor distribution plan.

53.     Dalton also claimed that the SEC investigation forced him to move investor funds offshore: "The reason [the investor funds escrow account] left the country is because the SEC came in and started investigating this whole thing and I was advised to move the money out of the country because if I didn't, they could seize it and it could be six months before you got your money back."

54.     As recently as October 29, 2010, Dalton made the following false statement to an investor:

> Oh man I'm telling you, I've been back and forth to that SEC office it's like my second home.  They are pounding me to death and the only reason that they don't arrest me or charge – I haven't even been charged with anything and the reason I haven't is because they know I'm honest, they know I showed them the vehicles whereby I'm going to pay this back and they know my intent.
>
> And they checked out my lifestyle.  I'm driving a 5 year-old Toyota and a 10 year-old Cadillac.  I'm not out there driving a Mercedes-Benz and wearing Rolex watches and crap like that off of your money.  I don't have your money.  The money is where it is.  So they know that and know I'm not Bernie Madoff, you know, I didn't go out there and get into a huge lifestyle off of your dough.  So they're backing off and letting me clean this thing up.

55.     Some investors, apparently believing Dalton's excuses as well as his claim that he is seeking out new ways of operating an investment, have expressed interest in investing their money in a new venture by Dalton.

        b.   <u>False Statements Regarding the SEC's investigation</u>

56.     All of the statements listed above regarding the SEC's actions in this investigation are false and are part of a his continuing scheme to lull investors  to

20

encourage future investments.  Dalton is not cooperating with the SEC's investigation and, in fact, has refused to answer even basic questions on the ground that a truthful answer might tend to subject him to criminal sanctions.  The SEC has not prevented Dalton or UCR from making distributions to investors.  Dalton has not consulted the SEC about a plan to repay investors nor is the SEC aware of any such plan.  In fact, as of August 31, 2010, Dalton and UCR's bank accounts had a total balance of less than $5,000.

## VI.   Offer and Sale of Unregistered Securities

57.     Section 5 of the Securities Act prohibits any offers, directly or indirectly, to sell a security unless a registration statement for that security has been filed with the SEC.   A registration statement is transaction specific.  Each sale of a security must either be made pursuant to a registration statement or fall under a registration exemption.

58.     The interests in the Trading and Diamond Programs were investment contracts, which are securities under federal law.

59.     At the time of the offers and sales of the interests in Dalton and UCR's Trading and Diamond Programs, there were no registration statements filed and in effect with respect to the Trading Program, the Diamond Program, or UCR.  No registration exemption applied to the Trading Program and Diamond Program securities.

60.     Dalton and UCR offered and sold interests totaling about $17 million in the Trading and Diamond Programs to investors in at least 13 states and three foreign countries. Both Programs were offered by UCR in multiple states and, except for the purported returns and identification of items being traded, the terms of the investment contracts were virtually identical.  Some investors invested in both Programs.  Many of the investors were

unsophisticated, did not understand the risks of the investments, and invested a significant portion of their entire savings in the programs.  For example, investors have told SEC staff  that the loss of their investment would be devastating, as it would be "a significant loss," "a very significant financial loss because it currently represents 100% of my remaining investment portfolio," and would "have a very negative impact o[n] my finances including my ability to support my family."

### VII.    Acting as an Unregistered Broker-Dealer

61.      Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from using jurisdictional means such as the telephone or mails to effect transactions in securities unless the broker or dealer is registered with the SEC.  Section 3(a)(4) of the Exchange Act defines a "broker" as any person who is engaged in the business of effecting transactions in securities for the account of others.  Section 3(a)(5) of the Exchange Act defines a "dealer" as any person engaged in the business of buying and selling securities for the person's own account through a broker or otherwise.

62.      Dalton participated in securities transactions of a broker-dealer with respect to the sale of interests in the Trading and Diamond Programs.   Dalton, UCR, and agents acting on their behalf actively solicited investors to purchase securities via e-mail, facsimile, and the United States mail.  Dalton had conversations with prospective investors on the telephone and met in person with prospective investors.  Dalton used the telephone, e-mail, facsimile, and the United States mail to effect purchases and sales of the interests in the Trading and Diamond Programs, which were securities, for the accounts of the investors.  He solicited existing investors to make additional investments by sending them payments made from fictitious profits.  These payments were sent to investors via bank wire and by checks via the United States mail. Dalton was not

affiliated with a broker-dealer registered with the SEC during the time in which he offered and sold the Trading and Diamond program interests to investors.

63.     Dalton received transaction-based compensation in that Dalton had sole control of the bank accounts containing investors' funds and misappropriated more than $ 1 million of those funds for his own personal use.  Dalton organized UCR's securities sales operations, solicited investors, and used "finders," "brokers," and other investors to solicit investors to purchase interests in the Trading and Diamond Program interests.  He was the only employee at UCR and thus was solely responsible for communicating with investors, effecting the securities transactions, and paying transaction-based compensation to "finders" and "brokers" in the form of a 1% monthly commission.  Neither Dalton nor UCR were registered as broker-dealers nor affiliated with any broker-dealers at the time of the offers and sales of the interests in Dalton and UCR's Trading and Diamond Programs.

**FIRST CLAIM FOR RELIEF**
**Fraud - Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**

64.    The SEC incorporates the allegations of paragraphs 1 through 62 as if fully set forth herein.

65.    UCR and Dalton, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, in violation of Section 17(a)(1) of the Securities Act.

66.    UCR and Dalton, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act.

67.    UCR and Dalton, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities, in violation of Section 17(a)(3) of the Securities Act.

68.    UCR and Dalton have violated, and unless restrained and enjoined will in the future violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**[15 U.S.C. §§ 78j(b) and 17 C.F.R. § 240.10b-5]**

69.     The SEC incorporates the allegations of paragraphs 1 through 68 as if fully set forth herein.

70.     UCR and Dalton, acting with scienter, by use of means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, used or employed, in connection with the purchase or sale of a security, a manipulative or deceptive device or contrivance in contravention of the rules and regulations of the SEC; employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person, in violation Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

71.     UCR and Dalton have violated, and unless restrained and enjoined will in the future violate Exchange Act Sections 10(b) and Rule 10b-5 [15 U.S.C. §§ 78j(b) and 17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Sale of Unregistered Securities: Violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]**

72.     The SEC incorporates the allegations of paragraphs 1 through 71 as if fully set forth herein.

73.     UCR and Dalton, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise, and carried or caused to be

carried through the mails, or in interstate commerce, by means or instruments of transportation, such securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities.

74.     UCR and Dalton have violated, and unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF
### Unregistered Broker-Dealer: Violations of Section 15(a)(1) of the Exchange Act
### [15 U.S.C. § 78o(a)(1)]

76.     The SEC incorporates the allegations of paragraphs 1 through 74 as if fully set forth herein.

77.     Dalton, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in or to induce or attempt to induce the purchase or sale of a security without being registered in accordance with Section 15(b) of the Exchange Act.

78.     By engaging in the conduct described above, Dalton violated Section 15(a)(1) of the Exchange Act by acting as an unregistered broker-dealer in connection with his offer and sale of securities.

79.     By reason of the foregoing, Dalton violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## FIFTH CLAIM FOR RELIEF
### Equitable Disgorgement Against Relief Defendant

80.     The SEC incorporates the allegations of paragraphs 1 through 79 as if fully set forth herein.

81.     Relief Defendant Marie Dalton obtained money, property and assets as a result of the violations of the securities laws by UCR and Dalton.

82.     Marie Dalton should be required to disgorge all illegal gains which inured to her benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

1.     Enter an Order finding that each of the Defendants UCR and Dalton committed the violations alleged in the First Through Fourth Claims for Relief in this Complaint, and unless restrained will continue to do so;

2.     Enter Injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently restraining and enjoining Defendants UCR and Dalton, and their officers, agents, servants, employees, attorneys, fictitious trade name entities, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating or any of the violations alleged;

3.     Enter an Order freezing the assets of Defendants UCR and Dalton, and Relief Defendant Marie Dalton and ordering the repatriation of foreign assets;

4.     Order that Defendants UCR and Dalton and Relief Defendant Marie Dalton disgorge all illegal gains, together with prejudgment and post judgment interest;

5.     Order that Defendants UCR and Dalton pay civil money penalties pursuant to pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)];

6.     Order that Defendants UCR and Dalton and Relief Defendant Marie Dalton, and any entities that they control, each prepare a sworn accounting of their receipt, disbursement and/or use of any funds received directly or indirectly from any investor and include a schedule

of each of their assets and liabilities and a schedule of the assets and liabilities of any entities that

they control; and

       7.      Order such other relief as this Court may deem just or appropriate.

Dated:  November 16, 2010            Respectfully submitted,

                                /s/Barbara T. Wells
                                Barbara T. Wells
                                Dugan Bliss
                                James A. Scoggins
                                John H. Mulhern
                                Attorneys for Plaintiff
                                U.S. Securities and Exchange Commission
                                1801 California Street, Suite 1500
                                Denver, CO  80202
                                (303) 844-1000